Littleton, Judge:
I concur in the result. I can not concur in the ultimate findings and in the opinion that there was a combination or agreement entered into with or by these plaintiffs in the conferences called by the Postmaster General in May 1930, or at any other time, “to prevent the making of any bid for carrying the mail,” within the meaning of Section 3950 of the Revised Statutes (U. S. C., Tit. 39, Sec. 432).
Whatever plan may have been in the mind of the Postmaster General at the time of the May 1930 conference, which the prevailing opinion finds was agreed to by the parties at that conference, was not only opposed by plaintiffs at that time but also in subsequent years. All of plaintiffs’ contracts which ever came into existence had been legally issued long prior to this time and came about through open competitive bidding. No fraud, conspiracy, or illegal acts were involved and their route certificates were issued under the governing statute in effect at the time of their issuance. There *797 is no contention to the contrary, and the prevailing opinion so finds. These contracts and route certificates were in noway affected by the events which occurred at the May 1930 conference. The May 1930 conference discussed the establishing of new routes and had nothing to do with contracts-already in existence. At that time plaintiffs had the only transcontinental route and obviously it was detrimental to* their interests to have additional transcontinental routes, established. Up to the time of the conference they vigorously opposed the additional routes because of the adverse effect it would have on their income from existing routes. Over their objection the Postmaster General proceeded with his determination to establish not only the transcontinental routes but various routes throughout the country. None of the recommendations at the conference for which extensions-were granted by the Postmaster General was in favor of plaintiffs nor were any of the routes on which the parties failed to reach an agreement for a recommendation routés for which plaintiffs were making any claim. The suggestion that plaintiffs entered into a combination or agreement and observed it in order to protect their rates is not, in my opinion, supported by the record. It is difficult to see how plaintiffs would be parties to an agreement which was so-directly opposed to their interests in the event the agreement was carried out and wherein they would and did obtain nothing. Not only do I think there was no agreement arrived at at the May conference of the character referred to in the-prevailing opinion but, in any event, I cannot see plaintiffs as party to any such combination or arrangement.
The meeting was open to the public. The publicity representative for the Post Office Department was present and. issued a press release at the time. During the period of the conference, the Second Assistant Postmaster General reported to Congress that the conference was being held and minutes, were kept of what occurred. Intelligent men of the type here-involved would hardly follow such a course in connection with an unlawful combination or conspiracy.
Plaintiffs were not only opposed to the transcontinental routes which the Postmaster General wanted to and did establish but they were opposed to the lengths to which the *798 Postmaster General went in making extensions. The prevailing opinion treats all these extensions as a part of the general plan formulated at the May conference. Plaintiffs’ representatives vigorously opposed these extensions and went to the extent of initiating one or perhaps two investigations by Congress of these acts of the Postmaster General. It hardly seems reasonable to say that these parties entered into a combination or agreement and scrupulously observed it when at the same time they were in active opposition to what the Postmaster General indicated he was going to do, and also having these acts of the Postmaster General investigated by Congress.
I think the record not only fails to show the existence of a ■combination or agreement within Section 3950 of the Revised Statutes but also shows facts directly opposed thereto. I do not think that anything Postmaster General Brown did after the May conference was in any way controlled or governed by any agreement at that conference. Certainly not so far as these plaintiffs were concerned. He was a man of strong determination and much interested in aviation and the air mail service. In his zeal to do what he may well have thought was for the best interests of the service he exceeded the authority given him by Congress and failed to observe Sections 3949 and 3709 of the Revised Statutes, U. S. C., Tit. 39, Sec. 429, and Tit. 41, Sec. 5, and the Watres Act. When it later appeared to the Postmaster General that express statutes had been disregarded in establishing air mail routes and letting air mail contracts, extended investigations were made both by the Congress and by the Post Office Department. The results of these investigations were reported to Postmaster General Farley and on the basis thereof, after careful consideration, he came to the conclusion that it was in the public interest to annul and cancel all existing route certificates and he did so. Having proceeded in that way on the basis of what was substantial evidence and having in mind the peculiar nature of these route certificates which, in my opinion, were subject to cancellation, his action of annulment and cancellation should be approved and sustained. In the circumstances, the propriety or legality of the Postmaster General’s action in 1934 was not affected by the fact that plaintiffs were not par *799 ties to any fraud or conspiracy nor bad entered into any combination or agreement to prevent the making of any bid for carrying the mail within the meaning of Section 3950.